The next case before us is 20-1392 Bell v. Sorin, and we are ready when you are, Council. You are on mute. We can't hear you. You're still muted. You're still muted. But it's very persuasive. Judge, it might take a minute to figure out. I'm sending him a prompt. So give us just a second here and hopefully we'll get it. Okay, thank you. Also, while he's trying to unmute, I'm going to reset the timer since it just turned a lovely lime green color. Okay, thank you. Now it shows you unmuted on our screen. Say something. Can you hear me now, Your Honor? Yes. Great. Okay, now you have to give us a minute because they had to restart the clock. So I'll let you know when we're ready to proceed. These are some of the new adventures with Zoom hearings. You can start the clock, Melissa. I am resetting it for some reason. It turned a weird lime green color, so I'm just resetting it so we don't have the lime green color. So it should be there in just a second here. There you go. Okay, thank you. All right. Now, when you're ready, Mr. Justman. Thank you, Your Honor. Good morning and may it please the court. This is a case where the plaintiff failed to prove damages. The parties agree that damages must be proved with reasonable certainty. Ms. Bell didn't do that, so the court should reverse. The damages theory that Ms. Bell presented was one of lost commissions. At a minimum, to establish reasonably certain evidence of lost commissions, you need three things. You need evidence of pricing. You need evidence of quantity. You take those and multiply those two together. And then you need the third thing, which is expenses or costs. You subtract that out and you have reasonably certain evidence of lost commissions. Why do you need an expert? Why do you need an expert? So this court's cases say that typically the general rule is when you have a damages calculation, you need an expert unless it's a common sense or straightforward calculation. Is it our cases we would look at or are we looking at Delaware? It's the same rule and it doesn't matter. So Delaware has the same general rule, whether it's a history of substance under Delaware law or procedure under this court's law. You don't always need an expert if it's just adding up some numbers. If it's simple, common sense, straightforward, you don't need it. But the court's cases say, and this is from James River and the LifeWise case, that if it's a complex issue, if there's multiple factors, if you've got to consider anything beyond common sense, straightforward calculations, you need an expert. Well, I guess the argument on the other side of the aisle is that this was a common sense calculation. You had Dr. McKenzie testify that he would have used Ms. Bell for 200 devices over the three year term each year. So you've got 600 devices. You take the average commission and you can calculate that easily from the evidence at trial. And you multiply that and you come up to a pretty reasonable estimate of what she would have made. What's wrong with that? So that's that's far. So there's a couple of ways I'll answer that. One is that there's layers of speculation within the evidence your honor recited and beyond that, even if one were to take the number that Dr. McKenzie speculated about and that's his word, he said it was his best speculation. That's beyond what this court's precedents say. So if you look at the James River case, it gives an example of what common sense, straightforward calculations mean. And the court says if you have one hundred and three numbers and you're literally adding them up, that's a common sense, straightforward calculation. Another case says it's like elementary school math here to come up with any reasonable number. You need evidence of quantity. You need evidence of pricing and you need to take out the expenses. There's no way. Why do you need to take out expenses? This is a woman who was paid commissions. She wasn't paid profit. She was paid commission. So, I mean, whatever it took her to earn that commission is not part of our analysis here. No, I think it is your honor. And the court's cases, including cases that talk about commissions, talk about how you need. You know, it's not gross. It's net, because obviously in a world that you're talking about, what would my ability to earn? What would it have been if I had been told what I thought I was told? You don't sell 200 devices per year or whatever the number might be at no cost to yourself. And so the court's cases say you need to subtract out expenses and sort of to address your honor's point about Dr. McKenzie. So they're talking about expenses that she would incur that are not reimbursed by the vendor or employer. I'm not sure whether they're technically employer. Yes, I was. And Ms. Bell was an independent contractor. So, and she's operating in this contract. So you do deduct out the cost that she incurred to generate any actual or hypothetical commissions, right? Correct. And if there were any evidence of that, we could do it. But there's zero evidence of that. I look forward to their theory changed. Am I right about that? The theory at trial was you can look to what she made at metronics. If I'm how you pronounce it and that you could extrapolate from what she was making there and determine what she should have been making here. If the fraudulent statement had been true. Am I right? This was a change forces in midstream. Yeah, it was quite maybe far across the stream. If you're wondering if I want to use your honor's metaphor. So even in the pretrial order, Ms. Bell's damages theory was if what Sorin had told me had been true. I would have gone to a different employer and I would have earned $750,000 more at a different employer. The evidence came out at trial that there were no positions available. So for the first time during closing argument, Ms. Bell's counsel came up with a different theory. And that theory was, well, you have to take this average and multiply it by, you know, 600 devices per year. Subtract out 55 or 45 devices per year and you get five, six million dollars plus bonuses. They've walked away. Obviously, didn't buy that. Right. I mean, it gave a much lower number than that, but a higher number than just the one year of actual sale or three years of actual sales. Correct. The jury awarded roughly just under one point four million dollars. Ms. Bell's commissions over three years was roughly four hundred and eighteen thousand. And then she had bonuses on top of that. Did that exceed what she was making before? Well, sort of to answer the question about what was making before you have to look at different data for a different company. And that's part of our that's part of the key parts of our analysis today is you can't compare what you made at Medtronic and use it as a basis for calculating damages. She was making over a million dollars at Medtronic. Right. She she had a commission on over 10 million dollars of sales there. Correct. Yeah, she she had quite a substantial book of business at Medtronic, which was the market leader. And on the other hand, Sorin, you know, was in her words, zero percent market share and was building a brand within the hospitals and the doctors within her territory. And so to to sort of apply a well, let's take Dr. McKenzie's two hundred devices per year speculation and multiply it by some average. That's that's far beyond what this court's cases on expert testimony require. What kind of an expert would you if you could plan your perfect trial? What kind of an expert would Ms. Bell have had to present in order to satisfy your argument? Yeah. So, I mean, obviously, it's not Sorin's job to decide what proof she presents. But, you know, in our view, you know, a couple of different types of experts might have suffice if they would have had foundation and ability to present the testimony. So you could have an industry expert, someone who knows the Los Angeles market, knows pricing of devices, knows, you know, hospital caps, knows the different types of devices and what patients they're best for, the number of sales per year, those sorts of things. Or you could have an accountant, someone who says, I went in, I did these calculations, I looked things up. But Ms. Bell didn't have either of those. And I'll just point out. Well, but even if you used an expert, even if you had the perfect expert, you would have to speculate here because the way her commissions were calculated depended on a whole lot of moving parts on what device was sold to which hospital because the price of device changed by hospital. And in what year, because her commissions changed depending on what year was sold. So we are really your position is, I mean, that would be speculation too, wouldn't it? Even if I had an accountant with a calculator, add up numbers, the numbers that he's adding in are being pulled out of the air. Right. So I'll answer that in a couple. Does that mean she can never get damages that there's no way in a contract like this that that she can make out a claim? No, our view isn't that, you know, someone in Ms. Bell's position could never get damages. And I'll answer your honor's question. And then I'd like to reserve, you know, whatever time is remaining for rebuttal. But I think the speculation that your honor points out is precisely why expert testimony is needed. And just imagine if an expert had testified, then we could have cross examined the expert on the fundamental assumptions. Why did you assume this number of devices? Why did you assume pricing at this hospital? Why did you assume, you know, this level of market share versus a different company? In order for us to review your contention that the damages award can't be affirmed without expert testimony, did you need to make the argument about the need for the expert at your halftime motion? Because it was only made, I think, in your renewed motion. Is that correct? No, that's not precisely correct. And I'll answer that in two ways. So we made it before trial. We made that argument in our motion in limine number one, and this is that appendix page 165. And we said, you can't offer opinions on damages because that requires expert testimony. And at that point, the damages theory was, as we talked about earlier, a totally different theory than what was ultimately argued to the jury. And there are cases that say, you know, issues of law, not evidentiary sufficiency issues, but issues of law don't need to be argued at halftime, right? And both parties cite the Miclaton case. There's a footnote in that case that says exactly that. And in any event, Ms. Bell has an argued waiver here. And we argued it after trial. The district court said these are the same arguments you presented. So the district court clearly thought everything was preserved. And so our view is, you need an expert. Ms. Bell didn't have one. And so the court should reverse on that basis. And I'd like to reserve the last three minutes of my time. Wait a minute. I'd like you to reserve, too, but I have a question first. How did you put on a damage theory that was not in the pretrial order? I mean, customarily, if somebody tries that, you object, and not in the pretrial order. Your Honor, she's finished. Did that happen? We didn't object in that way. We made arguments at every stage that says all of your damages theories are too speculative. The district court kept pairing them back. We made the Rule 50A motion that says, hey, now that Ms. Bell's case is done, there isn't sufficient evidence. The district court said, I'm denying it as to backward-looking claims. I'm granting it as to forward-looking claims. All right. So you didn't make an objection that the series of damage theories were not precluded. You didn't say they were precluded by the pretrial order. So, yeah. In other words, correct, Your Honor. We didn't object during closing to say this is something new. We've never heard it before. We just argued there's no evidentiary basis that would support it. So we'd like to reserve the rest of our time. Thank you. Thank you. Mr. Schaffer. Thank you. May it please the court, and I first want to make sure that I can be heard here in light of the difficulties. Yes, we hear you. Thank you very much. I represent the plaintiff, I believe, Brianna Bell. Ms. Bell is also appealing the district court's ruling after her case in chief limiting her damages to the three-year term of her contract. Would you agree that if we find that there should have been no damages at all because the evidence was insufficient, that that renders that claim moot? I would, Your Honor, yes. I want to talk about two issues in the limited time I have today. First, I want to describe to the court the substantial evidence in the record that supports the jury's verdict, amounting to $1.38 million over the three-year term of Ms. Bell's contract with Soren. And second, I want to address the abuse of discretion, the error of law that the district court committed in limiting her damages to the three-year term of the contract. Turning first to the calculation of damages, we have no idea what the jury did, do we? We don't. I mean, it's a general verdict form where they just gave us a number. And they would have to pull it out of the air. They have no idea what devices were sold or would have been sold. They have no idea what year they would have been sold in, nor do they know where those devices would have been implanted. Your Honor, that's not correct at all. In the record, the jury had evidence of not only the devices Ms. Bell was able to sell, 145 a year, given the absolute lack of the promised access. They had information about every one of those devices, where it was sold. And as Soren counsel points out, three-quarters of those were from McKinsey, so the pricing is baked into that. Well, and if three-quarters of those 145 were from McKinsey, then your speculation about what the jury was thinking doesn't work. Because you're arguing, you're double-counting some of those devices. You're saying he would have sold, she would have sold 200 to him each year, but she did sell 145. And you just said, I think, three-quarters were from McKinsey, so you should reduce the 200 then, right? No, Your Honor, and I appreciate the opportunity to respond to that, because the testimony is very clear. Dr. McKinsey testified, and just to give you some context, Dr. McKinsey is the most significant by volume of all the physicians in Bell's referral network that she had developed over 10 years. She's a leading EP in the L.A. market and has had a stable practice for 20 years, where he implants 400 to 500 devices of these CRM devices a year. He had worked with Bell for 10 years when she was at both St. Jude and Medtronic. McKinsey made very clear, and McKinsey was actually screening Bell's job opportunities at Soren, at Biotronic, at St. Jude, and at Boston Scientific. I'm not sure what relevance any of this has to the damage calculation. It's your time. Your Honor, let me narrowly answer your question, because McKinsey stated, and he testified both in his deposition and what he told Soren executives, is he said to them, I am going to use Bell myself for 200 devices a year. My group is going to do another 100 to 200. That's 300 to 400 devices. And McKinsey said, the only thing I need to be assured of here is that you have contractual access to my five hospitals. And they said, don't worry about it. We have that access. On day one, you can begin doing this. That's the lie at the core of the case. Now, what Bell did was over three years, she was able to sell 135 devices, Your Honor. That's 45 per year. Three quarters of those went to McKinsey. But if you just use the delta between the 200 he testified with great specificity that he would have used Bell for, and the 45 that she was able to sell, that's 155 a year. That's a shortfall. That's assuming that's counting the 45 she did sell. So the 155 a year shortfall multiplied by the average commission. Why would it be the average commission? And, you know, it matters what she sells, where she sells it, and when she sells it. Let me explain why the average commission is, in fact, the best evidence of that. The very best evidence, because that spans the three years. It spans the different hospitals. It spans the three different categories of devices. Bell earned an average commission of about $3,100 per device she sold it for over those three years. That's undisputed. That's the best evidence a jury can rely on. Did you argue that to the jury? Did anybody say to the jury, hey, jury, if you do this math, this is what her average commission is. Absolutely. No, you argued you your argument to the jury was based on what she made it metronics. No, Your Honor. The transcript will be very clear on Bell. Bell sold an average of 600 devices a year at Medtronic. That's clear. It's undisputed, and it's in the record. What I argued to the jury, which the jury rejected, which they were obviously free to, but I want to make clear what the argument was. I argued to the jury that Bell, because of the lack of access, was only able to sell 45 devices a year instead of the 600 that she would have been able to do, would have been able to replicate had full access been present. The jury rejected that that Delta, the 555 device shortfall multiplied by the 3101 dollars and 44 whatever that number is on the average that produced a requested amount of about 6 million dollars, which is what we asked for in our closing argument. We never, never changed our theory of damages on this in terms of what Miss Bell's damages were for the term of the contract. I'd like to focus, Your Honor, if I might, on why the courts. Basically changing it to wait a minute before you switch gears here. I'm completely confused. I thought that you're, you're basing your argument on appeal. If you take McKenzie's 200 a year, and you do an average, you come up with your damage theory, and the jury whittled that down. Isn't that what happened? Isn't that what you're arguing happened? No, Your Honor, what we argued to the jury, what I argued to the jury in closing argument. Well, I understand, you told me what you argued to the jury. Right, what we're arguing. But it was rejected, you said. No, and instead, what the jury clearly did is the jury had the testimony of McKenzie before it, where McKenzie is saying, myself alone, I was telling Soren executives, I'm going to do 200 a year with Bell. And Mahmoud, the executive at Soren, confirmed that. McKenzie said at least 200 a year. And that's if you have the contractual access, which they promised him they had. What the jury clearly did, or what it appears that they did, because as, as we know, we don't, we can't know precisely, they just gave us a general number. What the jury clearly did is took that 200, subtracted from that the 45 Bell was able to sell, that's 155 device per year shortfall, multiplied that by the average that Bell made per commission on the 135 devices she was able to sell. And that comes up with almost precisely the jury verdict. That's all simple math. Was there testimony specifically? This is the average price of devices. It's it's based on your honor exhibit three that's in the transcript it's it's a exhibit that was admitted that shows every device Bell sold the amount that that the price that was paid for that device, and the commission that she received. The damages aren't based on the devices she sold the damages or devices based on devices. She didn't sell. Right. And the best evidence is devices that she didn't sell devices that she did sell. I mean, well I mean I think I don't know what evidence is there to support that I mean isn't this exactly the kind of stuff you need an expert for. Absolutely not your honor the average in which is what the, the, in all of the cases that talk about what what a jury can and should rely on in cases like this, this isn't complex profits bell bell. The best evidence of what bell would have earned in commission on sales that she wasn't able to make because the access wasn't present is is again based on that three year history that bakes into the different hospitals were in her commission schedule. Bell's argument she's arguing that I could not sell devices in I think seven of the hospitals or whatever the number is at all. During this three year period because I didn't have access. So you're telling me that I should that the jury was free to look at the hospitals where she did have access, and the device that she sold in those different hospitals at different prices. And that is what the jury can use to determine what she would have sold in the other seven that she didn't have access to. No, your honor what I'm saying is that what the jury had in front of it and what it appears to have based its damage damage award is on McKenzie's testimony alone, about the fact that he would have any in your calculation you rely on the number 200 per year so 600. No, I rely on the 200 minus 45 is the 155 delta. Well, I just did on my calculator I don't get the number, the same number that the jury awarded. Your Honor, I mean, it's all explained in our brief, the way that yeah and I read you. I'm aware of that but you don't get the same number the jury awarded either. Well, it's it's within a percentage point. So, I mean, it's, it's, it's obviously a calculation that that fully supports jury verdict here. McKinsey 200 units. Are they all hypothetical cells to the same hospital, or multiple hospital. No McKenzie your honor had privileges at five different hospitals, they would have to be saying it at these various hospitals. I can guarantee that she'll sell 200 a year. Right. I mean, that's right. And don't don't those different hospitals, pay different prices for different for the same device you have one device, the hospitals are going to pay a different unit price for those aren't they. Well, Your Honor, the fact is, of the five mean bell was able to eventually get some limited contractual access to the, I believe all five of the hospitals in McKinsey's that he was privileged to practice that. So she had she was able to make some sales at all of those hospitals, not the not what she would have had the promised access from the very beginning been present. So, but they charge different, the, the, the vendor charge. Well, the hospitals paid different prices for the same device one hospital pay X price and the other hospital page Z price correct. Right, Your Honor and the differences are fairly negligible and all of that in terms of the average price per device, and the average commission paid by about the very best evidence of that is the average over her three years. There is a serious argument made that 1 of the reasons that is causing speculation is for any single device of multiple devices. The hospitals are going to pay a different price in that correct they make that argument right. Yeah, I mean they're okay okay now what you're saying in response that argument is the difference in prices between the different hospitals for a particular device is insignificant. Right, and it's also baked into the average that the jury relied on in in appears to have relied on in calculating the damage. That average what's baked into that average is an assumption that all of these hospitals and doctors would jump on the Soren bandwagon, to the same extent that they did to the metronics bandwagon and it's a different manufacturer of a different device I mean I like to think that it matters a little bit to the doctors, what they're implanting, Your Honor, and let me address that because it doesn't, it doesn't at all. In fact, it's based entirely on McKenzie's testimony alone. McKenzie also testified that in screening this opportunity with Val, he became intimately familiar and was excited about the Soren products. But that's one doctor. That's all that's needed to support this jury damage verdict. That testimony. That's all that is necessary. Because you want to use you. It's all that's needed to support 200 devices a year, but you want to use an average that is not just based on McKenzie jumping on the bandwagon 100%, but every other doctor in Miss Bell's book of business, saying I don't care if it's Miss Bell, I'll put that device in my patient, and we don't have any evidence of that. Well, Your Honor, if I might, my time is, you can answer my question yes please. Your Honor, the, the average. I mean, I'm not sure what other evidence that a jury could even rely on we can't based on sales that weren't made we can't call experts to say, I, you know, the testimony that we had is the best that we could offer on that subject, and the average of the 135 devices over three years sold to a number of the different seven or eight different hospitals across the three categories of CRM devices the best evidence that a jury could rely on to fix damages here, there's no questions damage occurred here, it's just the amount when there is some uncertainty in that that is not enough to overturn a jury verdict in what is the most sacrosanct and inviolate of the jury's functions to determine the amount of damages, when a wrong has occurred. That's what they did. Thank you. Thank you. Mr just men, you have two minutes. Okay, I'd like to make three points in rebuttal first I need to correct myself in response to a question judge Rossman asked I gave the wrong case site. So, for the proposition that you know an issue of law raised before trial doesn't need to be raised at halftime. That's the BP pipelines case for 73 federal appendix, 818, and then footnote eight, you'll find a direct site on that. Second to answer judge Murphy's question was there anyone at trial, a witness who testified about the average price the answer is no. No witness testified, but what the average price was that was an attorney's statement during closing argument based on an exhibit. Was there an exhibit, was there an exhibit from which that stated the average, or from what you could extract the average. The answers are no and yes so the exhibit is quite voluminous, if you look at volume six of the appendix it has all of the commissions and it's like dozens and dozens of pages and you can add it up and figure out what an average per commission or per device commission is. Well, that's what Mr. Schaefer said they did. And that's, that's, that's within the can of a jury to total up the numbers and divide by how many there are and get an average right. So a jury can can typically add up numbers, but it's not based on any testimony right so so this court has held it far stronger. And exhibit. So, so imagine that a witness had testified to this so this court has held in far stronger cases. The James River case the life wise case the US versus Griffith case that when you have someone who actually testifies, but, but they just give the same type of testimony, that's not enough. So, of course you already it can't be enough for just an attorney to make that point in closing argument. The final point I'll make your honor is in response to Mr Schaefer's point about the pricing. There was a pricing mismatch. So Miss Bell had access to five hospitals but those are the only five hospitals where there's pricing evidence. So, even if one wants to multiply Dr McKenzie's 200 devices per year number. There's no number to multiply it with, because the hospitals that she said she needed access to. There's no price for. I'll leave it at that and if there's no further questions or and asks that the judgment be reversed and remanded for entry of judgment as a matter of law in its favor. Thank you. We will take this matter under advisement.